IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JUANITA CARTER,

     Plaintiff,

v.

CLARK ATLANTA UNIVERSITY,

     Defendant.

CIVIL ACTION NO.
1:10-CV-247-WCO-LTW

## MAGISTRATE JUDGE'S FINAL ORDER AND REPORT AND RECOMMENDATION

This case is presently before the Court on Defendant Clark Atlanta University, Inc.'s Motion for Summary Judgment. Docket Entry [40]. For the reasons outlined below, Defendant's Motion for Summary Judgment should be **GRANTED**. Docket Entry [40].

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Juanita Carter ("Carter"), a Professor and Associate Dean, filed the instant lawsuit on January 28, 2010, alleging that Defendant Clark Atlanta University, Inc. ("CAU"), discriminated against her on the basis of her gender and retaliated against her when it selected lesser-qualified males for interim and permanent Dean positions and terminated her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). Carter further contends that CAU terminated her without

cause in violation of her tenure rights and employment contract. In CAU's Motion for Summary Judgment, it contends that summary judgment should be granted as to Carter's Title VII claims on the following grounds: (1) Carter's claims concerning her non-selection to the interim Dean position is time-barred; (2) Carter's discrimination claim concerning CAU's failure to promote her to the permanent Dean position fails because she cannot establish her prima facie case given that a female was selected for the position; (3) Carter's discrimination and retaliation claims relating to CAU's failure to promote her to the Dean position fail because she cannot show that CAU's legitimate, nondiscriminatory reason for rejecting her was pretextual; (3) Carter cannot establish her discriminatory termination claim because she cannot show that similarly situated males were treated more favorably or that CAU's nondiscriminatory reason for her termination was a pretext for discrimination; (4) Carter's retaliatory termination claim fails because she cannot establish a causal connection between her protected activity and her termination and she cannot demonstrate that CAU's reason for her termination was pretextual; and (5) Carter's breach of contract claims fail because her termination was in compliance with contract provisions allowing CAU to lay her off before the expiration of her contract in the event of an enrollment emergency. In Carter's Opposition to CAU's Motion for Summary Judgment, she failed to respond in opposition to CAU's summary judgment arguments against all of her discrimination and promotion claims. Thus, Carter's discrimination claims and promotion claims have been abandoned, and summary judgment should be **GRANTED** as to them. Hudson v.

Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); Bute v. Schuller Int'l Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding plaintiff abandoned a claim for retaliation under the ADA by failing to respond to defendant's argument on summary judgment that plaintiff failed to exhaust administrative remedies); Marion v. DeKalb Cnty., 821 F. Supp. 685, 688-89 n.4 (N.D. Ga. 1993) (holding that plaintiff abandoned his negligence claim by failing to respond to defendant's motion for summary judgment on this issue); see also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) (stating that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned" and declining to exercise its discretion to consider an argument in response to defendant's motion for summary judgment which plaintiff had previously failed to allege). Accordingly, the discussion below focuses only on Carter's retaliatory termination and breach of contract claims.

## FACTUAL BACKGROUND[1]

Carter served as an economics instructor for CAU from 1988 until 1993, when she

---

[1]All facts taken directly from the CAU's Statement of Material Facts as to Which There is no Genuine Issue to be Tried (hereinafter "DSMF") or Plaintiff's Statement of Material Facts ("PSMF") remain undisputed. This Court must accept as admitted those facts in the moving party's statement that have not been specifically controverted with citation to the relevant portions of the record by the opposing party. LR 56.1B.2(2), (3), NDGa. Subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact in order to withstand summary judgment. See Chapman v. AI Transp., 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc); Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); Carter v. City of Miami, 870 F.2d 578, 585 (11th Cir. 1989). Thus, this Court will not consider any fact (1) not supported by citation to evidence (including a page or paragraph number); or (2) stated as an issue or legal conclusion.

was appointed to the administrative position of Assistant Dean of Undergraduate Programs in the School of Business. (DSMF ¶¶ 1-2).   Carter also served as Associate Professor in the Department of Finance, which according to her employment contract, is separate and distinct from her administrative position. (PSMF ¶ 5; Deposition of Jeffrey Phillips, hereinafter "Phillips Dep.," Pl.'s Ex. 9). Carter was awarded tenure in approximately 1996 and as a result, she was entitled to an annual contract renewal by CAU until her retirement or resignation unless there was adequate cause for her dismissal by CAU. (DSMF ¶ 3). Carter's employment contract also provides that she would "have the full range of responsibilities described in her job description consistent with the policies and procedures of the university as described in the Faculty Handbook." (Phillips Dep., Pl.'s Ex. 9).  On June 15, 2001, Carter filed a lawsuit against CAU pursuant to Title VII and the Equal Pay Act of 1963, alleging that CAU paid her less than similarly situated male employees. (DSMF ¶ 4).  Around August 2004, Carter was appointed to the position of Associate Dean for Administration within the School of Business. (DSMF ¶ 6).

In October 2007, Jonathan Jefferson, the Dean of CAU's School of Business, resigned, and Edward Davis was appointed to the position of Interim Dean for the business school. (DSMF ¶ 8).  Carter asserts that in November 2007, she conversed with Dr. Carlton Brown, then the Executive Vice President and Provost of the University, about the decision to appoint Davis to the Interim Dean position. (DSMF ¶ 10; Deposition of Carlton Brown, hereinafter "Brown Dep.," 6). According to Carter,

the conversation transpired as follows:

> And I said that was - - I feel that I have been disrespected and I should have been in the interim dean position. And so he began the conversation saying, well, Davis had experience, et cetera. And I said, I have experience as well. I've done everything that a dean has been asked to do at this institution and especially in the school of business, so I see know reason why I should have been overlooked.
>
> And the conversation continued back and forth with regards to my qualifications, as I discussed them with him. And at a point - - I think maybe [out] of exasperation or whatever - - he said, well, you know you wouldn't have been appointed. And I said why? He said, you have history. And I said, what do you mean? History, litigation. And then I turned to him and looked at him with a real startled facial expression and I said, history?

(Carter Dep. 87-88). Dr. Lydia McKinley-Floyd was hired as the new Dean of the School of Business Administration around June 2010. (DSMF ¶ 21). Carter served as Associate Dean for Administration within the School of Business and Associate Professor in the Department of Finance until CAU laid her off on February 6, 2009.

## I.    The University's Layoff Policies and Procedures

The CAU Faculty Handbook provides that CAU may terminate "the services of a ranked faculty member before the expiration of the current contract, without prejudice as to performance," in the event of a layoff due to an "enrollment emergency." (Phillips Dep., Pl.'s Ex. 19). The Handbook defines enrollment emergency as "either a sudden or unplanned progressive decline in student enrollment the detrimental financial effects of which are too great or too rapid to be offset by normal procedures outlined in the Handbook." (Phillips Dep., Pl.'s Ex. 19, p. 82). The Handbook further provides that "[t]he president, after consultation with the University Senate Executive Committee and

the Executive Committee of the Board of Trustees, will make the policy declaration of a state of enrollment emergency to the university." (Phillips Dep., Pl.'s Ex. 19, p. 83). The Handbook explains:

> Once a state of enrollment or financial exigency has been declared, the Provost and Vice President for Academic Affairs, in consultation with the Academic Council, shall recommend action to the president. The president in consultation with the University Senate shall then recommend action to the Board of Trustees for their approval. Such action may be to eliminate some departments or programs in whole or in part, or to distribute layoffs throughout the faculty so as to prevent the elimination of any program or department.

(Phillips Dep., Pl.'s Ex. 19, p. 83). The Handbook specified that the procedures for an involuntary layoff, in part, are as follows:

> 1. All administrative ranked faculty shall first be laid off within the program or department involved, except as necessary to avoid serious distortion of program integrity.
>
> . . .
>
> 5. The appointment of a faculty member with tenure will not be terminated in favor of retaining a faculty member without tenure, except in extraordinary circumstances where a serious distortion of the academic program would otherwise result. The recommendation of extraordinary circumstances to the president will be made by the provost in consultation with the department chair, respective dean and the Academic Council Curriculum Committee.

(Phillips Dep., Pl.'s Ex. 19, pp. 84-85).

## II.   Brown Evaluates the Need for Layoffs at CAU

According to a first draft of an "Enrollment Management Plan" prepared by Darrin Rankin, the Vice President for Enrollment Services and Student Affairs, CAU's

enrollment declined from 5,740 students to 4,469 students over a nine year period spanning from fall 1997 to fall 2005. (Declaration of Jeffrey Phillips (Docket Entry 49-2), hereinafter "Phillips Decl.," Ex. 1, p. 15).   Rankin's report cautioned that "[u]ndergraduate enrollment declines are more significant in recent years and are likely to continue unless conditions producing the current trends are eliminated." (Phillips Decl., Ex. 1, p. 16).  In August 2008, Dr. Carlton Brown became President of CAU. (Brown Dep. 9).  In December 2008 or January 2009, Brown began evaluating whether there should be mass layoffs at CAU.  (Brown Dep. 10).  Brown recognized that CAU had been in a continuous enrollment decline for ten years.  (Brown Dep. 9).  Brown testified that due to declining enrollment, CAU had already reduced its operating budgets for several years in a row "down to the point where it was difficult for many units to function properly."  (Brown Dep. 14, 16).  Thus, Brown testified, decisionmakers rejected the idea of reducing budgets anymore because they would be at the point where they could not pay for paper.  (Brown Dep. 16-17).

### III.  Brown Discusses the Layoff Process with Phillips

In December 2008, Brown approached Dr. Jeffrey Phillips, the Associate Vice President for Academic Affairs, and informed Phillips that he intended to declare an enrollment emergency.  (Phillips Dep. 7, 16-17, 21).  At that time, Brown advised Phillips that he thought it would be necessary to lay off staff as a response to the enrollment emergency, requested Phillips' assistance in determining which faculty to lay off, and requested Phillips' guidance as to how to lay off faculty without running afoul

of the Faculty Handbook provisions. (Phillips Dep. 21-22, 24). Phillips prepared Brown a memorandum outlining guidelines for a process for conducting layoffs under the provisions of the Handbook. (Phillips Dep. 22, Pl.'s Ex. 10). Phillips memorandum to Brown explained that tenured faculty could be laid off under the present "extraordinary circumstances" because CAU was "experiencing a prolonged period of enrollment declines compounded by significant decreases in revenues." (Phillips Dep. 87-89, Pl.'s Ex. 10). According to Phillips, Brown and Phillips were concerned that the cash position of CAU was quite low and would not support the current level of expenditure. (Phillips Dep. 20, 24). Phillips believes that the cash position worsened because of the declining enrollment over a protracted period of time. (Phillips Dep. 26).

## IV.   **Brown Rejects Cost Cutting Measures Proposed by Faculty**

Prior to the layoffs taking place, faculty provided Brown with a list of ideas to save money at CAU. (Phillips Dep., Pl.'s Ex. 11). Phillips evaluated the ideas based on the immediate cash flow that he believed would be generated by the suggestions, determined that they would not help avoid the need for layoffs, and advised Brown of the same. (Phillips Dep. 26-29). Phillips did not seek any input as to whether the faculty suggestions, if implemented, could have averted the need for layoffs. (Phillips Dep. 29).

Brown testified that decisionmakers considered reduction of operating budgets to non-personnel resources, pay cuts, cessation of services, reductions in physical plant expenditures, increasing employee workloads, and administrative staff reductions. (Brown Dep. 14). Brown testified that he presented these measures to his accountant,

the Vice President for Business and Finance, the Controller, the budget planner, the compliance officer, the entire cabinet, and the Finance Committee of the Board of Trustees. (Brown Dep. 15). Brown also states that decisionmakers conducted some simple calculations showing that CAU's operating needs still could not be met if those cuts were made. (Brown Dep. 15-16). Brown states that when they considered the effect of salary percentage reductions, they concluded that the savings that could be generated were not substantial because the school year was already at the mid-year point. (Brown Dep. 17).

## V.    Other Staff Members Concluded that there was no Enrollment Emergency

In early Fall 2008, Brown requested an enrollment projection for Spring 2009 from Dr. Darrin Rankin, the Vice President of Enrollment Services and Student Affairs. (Affidavit of Dr. Darrin Quinn Rankin, hereinafter "Rankin Aff.," ¶¶ 2-3). Part of Rankin's job was to manage University enrollments. (Rankin Aff. ¶ 2). Rankin told Brown that his projection was 4,000 students. (Rankin Aff. ¶ 3). Brown told Rankin that he thought there would only be 3,400 students due to the state of the economy and began talking about the need for mass layoffs of faculty and staff. (Rankin Aff. ¶ 3). Rankin disagreed with Brown's projections. (Rankin Aff. ¶ 3). According to Rankin, by the third week in January, enrollment had reached 3,700 students, with more than a week left in the enrollment period. (Rankin Aff ¶ 4). Rankin states that during an early January 2009 phone call, Brown seemed displeased that enrollment numbers were growing. (Rankin Aff. ¶ 4). According to Rankin, Brown told him that he thought "everyone

understood that enrollment activity would cease and close at 3,400 students" and ordered hm to stop all enrollment activity immediately. (Rankin Aff. ¶ 4). Although Rankin did comply with Brown's request, Rankin states that he was "taken aback" and believed that Brown's directive "made no sense" because limiting enrollment for a tuition driven institution would financially hurt the university. (Rankin Aff. ¶ 4). Rankin states that "there was absolutely no enrollment emergency." (Rankin Aff. ¶ 5).

On January 28, 2009, Dean Davis of the Business School also advised Phillips that the declaration of an enrollment emergency seemed to be unjustified. (Pl.'s Ex. F). According to Davis, the normal attrition rates between fall and spring semesters was normally four to seven percent and that even if the attrition was seven percent, spring enrollment would be approximately 3,800 students. (Pl.'s Ex. F). According to Davis, spring enrollment was already approaching that number. (Pl.'s Ex. F). Davis further advised Phillips that much of the enrollment decline could be attributed to a phasing out of programs over the previous five years. (Pl.'s Ex. F). Thus, according to Davis, the "severe cuts [they] were contemplating [did not] seem to be justified by enrollment figures." (Pl.'s Ex. F). Brown did not look into the effect that the phase out of programs had on enrollment. (Brown Dep. 9).

## VI.  Phillips Emails Faculty Advising Them that CAU is Financially Sound

On February 5, 2009, the day before the layoffs were to take place, Phillips sent an email to the faculty of CAU to reassure them that CAU was financially sound and was not experiencing financial difficulties. (Brown Dep. 42, Pl.'s Ex. 20). Phillips testified

that when he stated that CAU was financially sound he meant that CAU was not in a financial exigency situation because the school was still paying its bills on time, but if circumstances did not change, the school would not be able to pay its bills later. (Phillips Dep. 94). Therein, Phillips also notified faculty that CAU was "experiencing the effect of the nation's economic condition," was definitely not closing, and was re-engineering the University to position the institution for further growth and progress. (Phillips Dep., Pl.'s Ex. 20). Phillips also stated that the enrollment emergency was not declared because of a need to solve an imminent financial problem, but rather declared in order to position CAU for better growth in the future. (Phillips Dep. 95).

Brown testified that he reviewed Phillips' statement before it was distributed and agreed with it. (Brown Dep. 42). Brown explained that financially sound is "translated to mean that an institution is doing what is necessary to manage its finances, to balance its budget, to meet its obligations, and to chart its future." (Brown Dep. 42). Brown continued, "You're not financially sound if in fact you are unable to pay your bills, you don't see a means by which you're going to be able to pay your bills in the short-term, you don't have means to chart for a long-term future." (Brown Dep. 42). Again, Brown explained that CAU was financially sound because it was doing what was necessary to manage its affairs, meet its obligations, and balance its budget. (Brown Dep. 43).

The October 17, 2008 minutes from a Board of Trustees meeting indicated that in September 30, 2008, the "cash position of the University [was] at $15,914,734" and "with access to cash at nearly $6M, the University is in a very solid position." (Pl.'s Ex.

I, p. 46). The minutes also provided, however:

> Given the current positioning of the University, trustee Walker cautioned that the University is challenged and should not be lulled into "false" sense of security. Cash balances are at risk from a number of factors and unless the University remains vigilant, he observed risk to the University's current financial position.

(Pl.'s Ex. I, Docket Entry 48-3, p. 46). Brown testified that he found out later the statement of the cash position was inaccurate in that it did not account for a "fairly significant set of liabilities" and as a result, the minutes did not represent "the true cash position of the University." (Brown Dep. 41).

## VII.   Faculty and Staff, Including Carter, are Laid Off

On February 6, 2009, CAU completed a mass layoff of thirty staff members and fifty-four faculty members, fourteen of whom were tenured. (DSMF ¶ 22-23; Brown Dep. 41). Brown testified that the layoff was conducted because of an enrollment emergency. (Brown Dep. 14). Brown further explained that financial calculations demonstrated that liabilities were encroaching and that if CAU did not take action at that time, it would "move to financial exigency" meaning that they would have to close the doors or severely alter the nature of the organization. (Brown Dep. 44). Phillips testified that the layoff was necessary because CAU's cash position was poor due to declining enrollment over a protracted period of time. (Phillips Dep. 24-26).

Carter's Associate Dean of Administration role was eliminated as part of the reduction in force. (DSMF ¶ 24). Handbook procedures allowed for elimination of administrative roles first. (Deposition of Edward Davis, hereinafter "Davis Dep.," 62;

Phillips Dep., Pl.'s Ex. 19, pp. 84-85).  After determining that Carter's administrative role should be eliminated, Davis considered her for a teaching role.  (Davis Dep. 63). Although Carter was qualified to teach in the Economics Department, it already had four tenured professors with doctorate degrees.  (Davis Dep. 63).  Davis and Phillips concluded that Carter could not be reassigned to a Finance Professor role because she was not academically or professionally qualified.  (Phillips Dep. 56-57).  To be academically qualified, a professor must have completed eighteen graduate semester hours or the equivalent in the discipline in which the professor is teaching and professionally accredited by the Association to Advance Collegiate Schools of Business ("the AACSB").  (Phillips Dep. 69).  The AACSB requires that to be accredited, a professor must have a doctorate in his or her discipline or be so extraordinarily qualified through such things as scholarship, research, or business experience. (Phillips Dep. 69). Carter, who had not completed her doctorate degree,  possessed neither academic nor professional qualification.  (Phillips Dep. 69-70, 106).

In a report entitled "Response to AACSB," the author asserted that Marcia Daley and Charles Richardson, new faculty hired in 2006 for the School of Business, were academically qualified even though they had not concluded their doctorate degrees and were instead designated as "ABD" status, or "all but dissertation."  (Pl.'s Ex. J; Declaration of Jeffrey Phillips, hereinafter "Phillips Decl.," ¶ 3). According to Phillips, professors can be academically qualified while being all but dissertation status for a period of no more than three years beyond the most recently completed graduate

comprehensive examination or other milestone that puts the student into dissertation stage. (Phillips Decl. ¶ 5).

Brown made the final decisions as to which faculty members would be laid off after receiving the recommendations of the Deans, Directors and Department Chairs. (Brown Dep. 18; Davis Dep., Pl.'s Ex. 6). Brown states that the recommendations were fully vetted by a committee and were then presented to Brown. (Brown Dep. 18; Davis Dep., Pl.'s Ex. 6).

Brown admits that a large part of his decision depended on the faculty's productivity assessment scores, which were based upon teaching, scholarship, and service. (Brown Dep. 18; Phillips Dep. 104). According to Phillips, these productivity scores were completed by the heads of various departments to assess the productivity of the faculty members. (Phillips Dep. 102). Davis states that he did not perform a productivity assessment on Carter because he only did them for faculty and Carter was serving in an administrative capacity as Associate Dean. (Davis Dep. 55-56). Phillips did complete a productivity assessment on Carter. (Phillips Dep. 104). Although Phillips assigned Carter a productivity score of 1.8, Phillips testified that the score was "not valid" and if he were to do it again, he would not have scored her at all because 90% of her job was not teaching, scholarship or service. (Phillips Dep. 105). Phillips further testified that assigning Carter a higher productivity score, however, would not have changed the decision as to whether to lay off Carter because she was selected due to her failure to meet accreditation standards. (Phillips Dep. 105). According to Phillips,

Carter's productivity score did not influence the decision to lay her off.  (Phillips Dep. 106).    Nevertheless, he did report Carter's productivity score to Brown.  (Phillips Dep. 103-05, Pl.'s Ex. 6).

## LEGAL ANALYSIS

### I.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for her motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Apcoa, Inc. v. Fid. Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required, however, to negate her opponent's claim; the movant may discharge her burden by merely "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. After the movant has carried her burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like.[2] Id. at 324

---

[2] In December 2010, amendments to Rule 56 became effective, and Rule 56(c)(1) now regulates a party's procedure for asserting that a fact is not genuinely in dispute (or is genuinely in dispute):

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
(A) citing to particular parts of materials in the record, including

(quoting Fed. R. Civ. P. 56(e)).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material when it is identified as such by the controlling substantive law. Id. at 248. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Anderson, 477 U.S. at 249-50. Thus, the Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence

---

> depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

of *every* element essential to that party's case on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

## II.   Carter's Retaliation Claim

Carter contends that CAU violated Title VII when it terminated her in retaliation for filing a discrimination lawsuit in 2001. Conversely, CAU contends that summary judgment should be granted as to Carter's retaliatory termination claims because she fails to demonstrate (1) a causal connection between her 2001 lawsuit and her termination; and (2) that the legitimate, nondiscriminatory reasons for her termination were pretextual.

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In the absence of direct evidence, as in the instant case, claims of retaliation follow the McDonnell Douglas burden-shifting framework. Goldsmith v. City of Atmore, 996 F.2d 1155, 1162-63 (11th Cir. 1993). To make out a prima facie case of retaliation under Title VII, the plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) she suffered an adverse employment action by the employer simultaneously with or subsequent to such opposition or participation; and (3) a causal connection exists between the protected activity and the adverse employment action. Crawford v. Carroll,

529 F.3d 961, 970 (11th Cir. 2008); see also Godby v. Marsh USA, Inc., 346 F. App'x 491, 493 (11th Cir. 2009) (applying same prima facie case in reduction in force case). Carter's retaliation claim fails because she cannot demonstrate the requisite causal connection or that CAU's legitimate, non-retaliatory reason for terminating her is pretextual.

## A.    No Causal Connection

CAU argues that Carter cannot establish a causal connection because more than six years passed between the conclusion of her lawsuit and her termination and Carter has no other evidence of evidence of causation.  This Court agrees.  To establish the requisite causal connection, the plaintiff must, at a minimum, show that the decisionmaker was aware of her protected conduct, and that the protected activity and the adverse action were not wholly unrelated. McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008), cert. den'd McCann v. Cochran, 129 U.S. 404.  Absent additional evidence of causation, "mere temporal proximity between knowledge of protected activity and an adverse action must be very close." Porter v. Am. Cast Iron Pipe Co., No. 10–14017, 2011 WL 1990667, at *2 (11th Cir. May 23, 2011); Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004). "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." Higdon, 393 F.3d at 1220; see also Adams v. Cobb Cnty. Sch. Dist., 242 F. App'x 616, 621 (11th Cir. 2007) (three year gap between protected activity and adverse action does not allow reasonable

inference of causation).  In this case, both Brown and Phillips were aware that Carter previously had filed a discrimination lawsuit.  (Pl. Dep. 87-88; Phillips Dep. 108-09). However, Carter fails to present any evidence that her 2009 termination and her 2001 lawsuit were related.  Without more evidence of causation, no reasonable juror could infer the existence of a causal connection given more than six year interval between the conclusion of Carter's lawsuit and her termination.  Porter, 2011 WL 1990667, at *2-3; Boyland v. Corrs. Corp. of Am., 390 F. App'x 973, 974-75 (11th Cir. 2010) (2.5 years too long to support any inference of causation).  Additionally, Carter fails to present any other evidence of causation.

Carter argues that Brown's alleged statement implying that she would not get the interim Dean position because of her litigation history was evidence of causation because Brown was the decisionmaker who decided to eliminate her position as part of the layoff. This Court does not find that Brown's statement establishes the requisite causal link.  At the time of Carter's alleged rejection for the interim Dean position, Brown was not the President of CAU and Carter has presented no evidence to connect him to the decision not to select her for interim Dean.  Furthermore, Brown's alleged statement is not an indication that he harbored retaliatory animus, but  rather Brown's perception that the decisionmaker who decided not to appoint Carter to the interim Dean position harbored retaliatory animus.  Moreover, there is no foundation for Brown's alleged statement; the statement, standing alone, appears to be nothing more than Brown's speculation as to the reason Carter was not appointed interim Dean in 2007.  Lastly, Carter's argument that

CAU's position statement which explained that Carter's previous complaint of discrimination relating to CAU's initial failure to grant her tenure were "completely frivolous" demonstrates CAU's retaliatory animus is unpersuasive. The fact that CAU's General Counsel would advocate that a previous complaint of discrimination, not at issue in this case, was "completely frivolous" is also not sufficient to show retaliatory animus.

### B.   No Showing of Pretext

Even assuming that Carter could demonstrate the requisite causal connection, Carter's retaliation claim still fails as a matter of law because she fails to raise a genuine issue of material fact as to whether CAU's non-retaliatory reason for terminating her is pretextual. Once the plaintiff makes out a prima facie case, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999). "If the defendant offers legitimate reasons, the presumption of retaliation disappears," and "[t]he plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." Id.  Applying the law to the facts of this case, CAU's rationale for terminating Carter, that Carter was selected for layoff because the Handbook required the elimination of administrative positions first and Carter was not academically qualified to return to teaching in the Finance Department, is a legitimate, non-retaliatory reason. Bowers v. Peake, 366 F. App'x. 562, 563 (5th Cir. 2010); Adams v. Grosbeak Index. Sch. Dist., 475 F.3d. 688, 691 (5th Cir. 2007).

A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff casts sufficient doubt on the defendant's proffered non-retaliatory reasons to permit a reasonable factfinder to conclude that the proffered reasons were not actually what motivated its conduct. McCann, 526 F.3d at 1375-76. This may be accomplished either by directly persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 920-21 (11th Cir. 1993). In doing so, the court evaluates whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." McCann, 526 F.3d at 1375-76; Combs v. Plantation Patterns, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997). The plaintiff must meet each of the employer's legitimate reasons "head on" and not simply quarrel with the wisdom of the reasons. Chapman, 229 F.3d at 1030.

In this case, Carter argues that CAU's rationale for her termination was pretextual because: (1) there was no enrollment emergency; (2) CAU did not follow the proper procedures that would allow it to legitimately conduct layoffs; (3) CAU's decision to retain non-tenured faculty members instead of her was inconsistent with the Faculty Handbook and irrational; and (4) Carter was selected for layoff based on a productivity score which Phillips later admitted was invalid. Each of Carter's arguments individually and collectively fail to demonstrate pretext.

1.   Enrollment Emergency

Carter theorizes that Brown's determination that CAU was suffering from an enrollment emergency was merely a ruse to allow him to purge undesirable employees from the faculty and staff and that she was an undesirable employee because she had previously sued CAU for sex discrimination.  In support, Carter argues that there was no enrollment emergency because Rankin stated that was no enrollment emergency, Davis attributed the enrollment decline to a phasing out of academic programs, and there was no serious imminent financial harm from the declining enrollment.  Carter's theory fails as a matter of law.  It is undisputed that during a nine-year period spanning from fall 1997 to fall 2005, the number of students enrolled dropped from 5,740 students to 4,469 students. (Phillips Decl., Ex. 1, p. 15).  Furthermore, it is undisputed that as of Fall 2008, the enrollment had further declined to 4,100 students, representing a total drop for an approximately eleven year period of approximately 29% of the students. (Phillips Dep., Pl.'s Ex. 12, Rankin Aff. ¶ 3).  Both Rankin, Davis, and Brown expected the enrollment to drop again for the 2009 Spring semester, but had differing viewpoints as to how much lower the enrollment would be.  Rankin expected 4,000 students and Brown expected 3,400 students.  (Rankin Aff. ¶ 3; Brown Dep. 27-28).  Davis projected that the 2009 Spring enrollment would be 3,800 students and that much of the previous five years of enrollment decline could be attributed to the fact that some previously offered academic programs had been "phased out."  (Pl.'s Ex. F).

Davis, Rankin, and Brown's differing viewpoints do not, without more,

demonstrate pretext. A plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer. Combs, 103 F.3d at 1543. Indeed, federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [civil rights laws] do not interfere. Rather [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)); see also Nix v. WLCY Radio/Rahall Comms., 738 F.2d 1181, 1187 (11th Cir. 1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). In this case, Brown explained his conclusions about the projected enrollment and his determination that there was an enrollment emergency and Carter presents no evidence showing that Brown did not honestly believe that the enrollment was going to decline more than Rankin and Davis projected. Brown testified that he expected a drop to 3,400 students because he had observed the university drop in enrollment for more than 10 years and because of his "read of the economy at the time."[3] (Brown Dep. 27). Additionally,

---

[3] Carter also insinuates that Brown was squelching further enrollment so that he could purge undesirable employees because he indicated displeasure at growing enrollment numbers prior to the spring 2009 semester and told Rankin to stop

Brown noted that CAU's enrollment had fallen short of Rankin's projections in the past. (Brown Dep. 27). Furthermore, Brown did not believe that there was any evidence that the decline in enrollment over the previous years were due to the university phasing out previously offered academic programs. (Brown Dep. 9). Given that Brown's conclusion and decision was not unreasonable, Carter, without more, cannot demonstrate that the stated motivation for the reduction in force was pretextual.

Carter further argues that there was no enrollment emergency because the definition of enrollment emergency in CAU's Handbook required that there not only be an enrollment emergency, but also that the "detrimental financial effects of which are too great or too rapid to be offset by normal procedures." Carter argues that a reasonable factfinder could disbelieve that the financial effects of the declining student enrollment would be too great or too rapid to be offset by normal procedures because Phillips advised faculty via email that CAU was financially sound, Phillips' admitted that there was no "imminent financial problem" at the time, and the Board of Trustees' minutes indicated that CAU had a solid financial position.

Phillips' statements about the financial condition of the university are supportive of the position that layoffs were needed to avert a detrimental financial effect which

---

enrollment activity. Carter, however, does not controvert Brown's testimony that he ordered Rankin to stop enrollment because of his concern that CAU had passed or was about to pass the census date, which is the federal reporting date for enrollments relative to financial aid. (Brown Dep. 30-31). According to Brown, if they did not close enrollment by the census date, they could not draw down financial aide that the students had in put in place for enrollment and could not accurately project the University's finances going forward. (Brown Dep. 30-31).

could not be offset by normal procedures.  As Carter points out, the Handbook defines enrollment emergency "as either a sudden or unplanned progressive decline in student enrollment, the detrimental financial effects of which are too great or too rapid to be offset by normal procedures outlined in the Handbook."  (Phillips Dep., Pl.'s Ex. 19). Phillips testified that prior to the reduction in force, CAU's cash position worsened because of the declining enrollment over a protracted period of time and that the cash position would not support the current level of expenditures.  (Phillips Dep. 24-26, 87-88).  Thus, Phillips identifies the "detrimental financial effect" caused by the declining enrollment required by the Handbook provisions.  Carter argues that Phillips' statements in this regard are unworthy of credence because on February 5, 2009, the day prior to the day employees were laid off, Phillips also said:

> Clark Atlanta University, like many other colleges and universities, is experiencing the effect of the nation's economic condition.  We have been carefully and thoughtfully evaluating how we, as a university, must work together collectively to move forward prudently, responsibly and effectively through this uncertain period in our nation's history.
>
> First, we want to assure you once again that Clark Atlanta University is definitely not closing.  In fact, we are re-engineering the University to position the institution for further growth and progress.
>
> *Second, we want to reassure you that Clark Atlanta University is financially sound; CAU is not experiencing financial difficulties.*

(Phillips Dep., Pl.'s Ex. 20) (emphasis added).  First, it is worthy of noting that consistent with Phillips' former statements, he states that CAU is experiencing the effect of the nation's economic condition and that they were evaluating how to move forward prudently and responsibly.  Second, Carter's comparisons of Phillips' statements are

unpersuasive because the comparisons involve two different points in time. Phillips' statements that the cash flow position would not support the current level of expenditures reflected the state of the University's finances if no changes were made. The email sent to faculty reflected Phillips' thoughts after the decision to cut staff was made and, at the time, the decision was being implemented. Indeed, Phillips explains in his deposition that when he stated that CAU was not facing financial difficulties and was financially sound, he was expressing his belief that the University was not in a "financial exigency" situation and that the school could continue to pay its bills on time. (Phillips Dep. 94; see also Brown Dep. 42-43). Phillips cautions, however, that if the University had not taken any action, that in subsequent months, there was a distinct possibility that CAU would no longer be able to pay its bills. (Phillips Dep. 94).

Carter's discussion of the minutes from the Board of Trustees meeting is similarly unavailing. The minutes reflect that Trustee Walker advised that "with access to cash at nearly $6M, the University is in a very solid position." (Pl.'s Ex. I, p. 46). Carter fails to discuss the fact that Trustee Walker also "cautioned that the University is challenged and should not be lulled into a 'false' sense of security," that "cash balances were at risk from a number of factors," and that "[u]nless the University remained vigilant," there was risk to the University's current financial position. (Id.). Furthermore, Carter has not provided any evidence to dispute Brown's statement that they later learned that the statement of the cash position in the minutes was inaccurate because the Trustee merely provided a statement of cash on hand in a checking account without having accounted

for a "fairly significant set of liabilities." (Brown Dep. 41).

### 2.   Deviation from Layoff Procedures

Carter further argues that the layoff was Brown's attempt to purge undesirable employees because he acted contrary to Handbook provisions requiring that the decision to "lay off faculty must follow the declaration of an enrollment emergency . . . ." (Pl.'s Br. 15-16). Carter's theory is that Brown made the decision to lay off faculty and staff prior to the actual declaration of an enrollment emergency. Carter's theory is not borne out by the facts and does not give rise to an inference of pretext. Section 2.8.5.4 of the Handbook provides:

> Once a state of enrollment or financial exigency has been declared, the Provost and Vice President for Academic Affairs, in consultation with the Academic Council, shall recommend action to the president. The President in consultation with the University Senate shall then recommend action to the Board of Trustees for their approval. Such action may be to eliminate some departments or programs in whole or part, or to distribute layoffs throughout the faculty so as to prevent the elimination of any program or department.

(Phillips Dep., Pl.'s Ex. 19, p. 83). Carter's evidence falls short of a violation of this policy, however, because it only shows that prior to the time an enrollment emergency was declared, Brown was evaluating the process for conducting employee layoffs. (Phillips Dep. 22). Additionally, there is nothing within the policy that precludes the President of the University from evaluating the need for layoffs or even concluding for himself that layoffs are necessary and creating a plan of action before the state of enrollment emergency is declared. Indeed, the process above seems to encourage the President to do so since it requires that at step two of the process that he will recommend

27

action to the Board of Trustees. Furthermore, given that it is undisputed that enrollment had decreased for more than a decade and that there was concern that if no action was taken, CAU would not be able to pay its obligations in the future, Brown's actions to evaluate possible solutions and formulate a plan are reasonable and do not give rise to an inference of pretext.

Carter further argues that in contravention of the Handbook procedures, CAU never evaluated whether "normal procedures" could offset the financial effects of declining enrollments before layoffs were enacted. In support, Carter argues that Phillips ignored faculty suggestions for cost cutting measures and never submitted them to the Finance Department to determine whether the savings generated could have avoided the layoffs. Brown testified, however, that other measures short of layoffs had already been taken. For instance, CAU had already been reducing operating budgets for several years in a row, "down to the point where it was difficult for many units to function properly" and that budgets could not be reduced anymore. (Brown Dep. 16-17). According to Brown, even if small savings were found, it would not be enough to meet their requirements at the time. (Brown Dep. 17). Brown further testified that they could no longer reduce employee salaries because their salaries were substandard for CAU's classification of institution in every category. (Brown Dep. 17). Additionally, it is undisputed that Brown considered reduction of operating budgets to non-personnel resources, pay cuts, cessation of services, reductions in physical plant expenditures, increasing employee workloads, and administrative staff reductions. (Brown Dep. 14).

Brown testified that he presented these measures to his accountant, the Vice President for Business and Finance, the Controller, the budget planner, the compliance officer, the entire cabinet, and the Finance Committee of the Board of Trustees. (Brown Dep. 15). Brown also states that he had a document that outlined some simple calculations showing that CAU's operating needs still could not be met if those cuts were made. (Brown Dep. 15-16).

Carter argues that a reasonable factfinder could reject Brown's testimony because CAU never produced the document showing the calculations. (PSMF ¶ 38). Carter, however, fails to provide any evidence in support of her assertion that such information was requested and was not produced. Furthermore, Carter fails to provide any evidence of any circumstances which could lead a reasonable factfinder to conclude that a failure to produce the evidence was in bad faith. As for the measures proposed by the faculty, Phillips testified that he did consider them, he just concluded that they were not sufficient to avert the need for layoffs and reported the same to Brown. (Phillips Dep. 26-28, Pl.'s Ex. 11). In contrast, Carter presents no evidence or analysis indicating that CAU's implementation of the faculty suggestions would have averted the need for layoffs or that Brown's rejection of the suggestions was unreasonable. Accordingly, a reasonable factfinder could not conclude, based on this record viewed in the facts most favorable to the Carter, that CAU did not evaluate whether "normal procedures" could offset the financial effects of declining enrollments.

3.   Carter's Selection

Carter further argues that reasons for her selection were pretextual on the grounds that (1) the decision did not conform to the Handbook procedures because non-tenured faculty were retained instead of her; (2) until the layoffs, her academic qualifications had never been questioned and other faculty who did not have their doctorates had previously been considered academically qualified; and (3) the decision was based, in part, on an invalid productivity assessment.

a.   Retention of Non-Tenured Faculty who Were Academically Qualified Over Tenured Faculty who Were not Academically Qualified did not Give Rise to an Inference of Pretext

Carter argues that according to the Handbook procedures, she should have been retained instead of Dr. John Young, a non-tenured male professor, because the Handbook procedures require that tenured professors be retained except when "extraordinary circumstances where a serious distortion of the academic program would result." Carter further argues that CAU has not "come close to showing that a serious distortion of the academic program would otherwise result."

Even assuming that CAU deviated from the tenure policy to the benefit of tenured professors over non-tenured professors, Carter does not present evidence showing that such deviation from policy was motivated by retaliatory animus. The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual. Keaton v.

Cobb Cnty., No. 08-11220, 2009 WL 212097, at *5 n.6 (11th Cir. Jan. 30, 2009) (finding that failure to follow procedure was "minimal" and did not give rise to inference of pretext); Springer v. Convergys Customer Mgmt. Group, Inc., 509 F.3d 1344, 1350 (11th Cir. 2007); Mitchell v. USBI Co., 186 F.3d 1352, 1355-56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."). Indeed, in order to establish pretext, a plaintiff must also show that the deviation from policy occurred in a discriminatory manner. Rojas v. Fla., 285 F.3d 1339, 1344 n.4 (11th Cir. 2002). A deviation in policy that affects individuals who have engaged in protected activity in the same manner as individuals who have not engaged in protected activity is not a deviation from policy in a discriminatory manner. Rojas, 285 F.3d at 1344 n.4; see also Brown v. Am. Honda Motor Co., 939 F.2d 949, 951-52 (11th Cir. 1991). In this case, the alleged deviation from policy has not been shown to be applied in a discriminatory manner. There is no showing that the deviation of policy was applied in a way to harm those who have complained of discrimination more than those who have not. Indeed, the only showing is that CAU indiscriminately was favoring faculty who were academically qualified over those who were not.

> b.   Previous Failure to Question Academic Qualifications

Carter further argues that her academic qualifications could not have been the real reason she was terminated as part of the reduction in force because she had taught at CAU for years and her academic qualifications had not been questioned. The essence of a reduction in force, however, is that competent employees, who, in more prosperous

times would continue to flourish at an organization, may nevertheless have to be terminated. Lockaby v. United Testing Group, Inc., 986 F. Supp. 1400, 1405 (N.D. Ga. 1997) (Carnes, J.) (quoting Thurman v. Robertshaw Control Co., 869 F. Supp. 934, 939 (N.D. Ga. 1994) (O'Kelley, C.J.)). Thus, the mere fact that Carter was retained when her academic qualifications were lacking does not in itself give rise to an inference of pretext. Furthermore, Carter does not present any evidence that she was unfairly singled out for consideration of her academic qualifications, and indeed, others were recommended for termination due to failure to complete terminal degrees or failure to meet academic qualifications. (Davis Dep., Pl.'s Ex. 6, pp. 17-19).

Instead, Carter attempts to attack CAU's determination that she was not academically qualified by referring to Plaintiff's Exhibit J, a 2005 draft response to the AACSB, which stated that Marcia Daley and Charles Richardson were academically qualified even though they had not obtained their terminal degree and were only ABD status, meaning "all but dissertation." (Pl.'s Ex. J). The AACSB, however, provides that an instructor who has completed post-graduate studies and is ABD can have academically qualified status for a period of "no more than three years beyond the most recently completed graduate comprehensive examination or other milestone that puts the student into dissertation stage." (Phillips Decl. ¶ 5, Ex. 3, p.44). Carter presents no evidence that Daley and Richardson, as of 2005, had exceeded the three years beyond their "most recently completed graduate comprehensive examination or other milestone

that [put them] into dissertation stage."[4]  Thus, no inference of pretext arises from Daley and Richardson's designation as academically qualified at that time.  Although Carter contends that she also had ABD status, Carter presents no evidence that she had not exceeded the three years.  Thus, no inference of pretext arises from Carter's designation as not academically qualified.

c.    The Productivity Assessment Score

Carter finally contends that she was treated inappropriate[ly] even under the procedures created by Phillips and Brown because Brown testified that a "large part" of his decision regarding who to lay off was based on the supervisor's assignment of a productivity assessment score and Phillips admitted that he assigned Carter an invalid, low productivity score of 1.8 out of 5.  It is true that the circumstances surrounding the assignment of Carter's productivity score are curious.  However, in this case, the evidence presented does not show that Carter's productivity score played a part in the decision to terminate her.  Although Carter's counsel asked Brown during his deposition generally whether a large part of his decision with regard to who would be laid off was based on the productivity assessment scores, Carter's counsel never asked any questions about Brown's specific decisionmaking with regard to Carter.  (Brown Dep. 18).  Thus, given that Brown was only speaking in general terms, there is no evidence that productivity assessment score played any part with respect to Carter's selection.

---

[4]  Indeed, Phillips stated that Daley and Richardson have since obtained their doctorate degree.  (Phillips Decl. ¶ 6).

Moreover, Phillips testified that the productivity assessment score played no part in the decision with regard to Carter and that the decision was made based on her academic qualifications. (Phillips Dep. 105-06). Indeed, in Phillips' February 2, 2006 written recommendation to Brown identifying which professors should be terminated as a part of the reduction in force, Phillips indicated that the justification for Carter's termination was that she was "not academically qualified per AACSB," that she had "no terminal degree," and that although she was assigned to the Finance Department, she had not completed the eighteen graduate semester hours in finance. (Phillips Dep. 103; Davis Dep., Pl.'s Ex. 6).

Even if Carter's evidence could support an inference that Carter's productivity assessment score played some part in the decision to eliminate her position as part of the lay off, Carter still could not survive summary judgment because she has not shown that CAU's stated reason for her termination, lacking academic qualifications due to her failure to achieve a terminal degree, was pretextual. In order to avoid summary judgment, a plaintiff must produce enough evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual. Chapman, 229 F.3d at 1024-25; see also Connor v. Lafarge N. Am., Inc., 343 F. App'x 537, 543 (11th Cir. 2009). Because Carter has not raised a genuine dispute as to causation or pretext, summary judgment should be **GRANTED** as to Carter's Title VII retaliation claim.

## III.   **Breach of Contract Claim**

Carter's state law breach of contract claim should also be dismissed. Because the Court has recommended that summary judgment be granted as to Carter's federal law claims, the undersigned is now recommending that Carter's state law claims be dismissed without prejudice. According to 28 U.S.C. § 1367, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court explained that exercising supplemental jurisdiction requires a federal court to consider judicial economy, convenience, fairness, and comity. The Court held that:

> When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of a lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (footnote omitted); see also Novak v. Cobb Cnty.-Kennestone Hosp. Auth., 849 F. Supp. 1559 (N.D. Ga. 1994) (dismissing state law claims without prejudice upon granting summary judgment on all pending federal claims), aff'd, 74 F.3d 1173 (11th Cir. 1996). Because it is recommended that summary judgment be granted as to Carter's federal claims, her only remaining claims rely on applicable state law. The undersigned therefore **RECOMMENDS** that Carter's remaining breach of contract claim be **DISMISSED WITHOUT PREJUDICE**.

## **CONCLUSION**

Based on the foregoing reasons, Defendant's Motion for Summary Judgment should be **GRANTED**.   Docket Entry [40].   As this is a final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this   19th   day of August, 2011.


/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JUANITA CARTER,

       Plaintiff,

v.

CLARK ATLANTA UNIVERSITY,

       Defendant.

CIVIL ACTION NO.
1:10-CV-247-WCO-LTW

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 72.1C. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation **within fourteen (14) days of the receipt of this Order**. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983),

cert. denied 464 U.S. 1050 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

**SO ORDERED**, this __19th__ day of August, 2011.

/s/ Linda T. Walker_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE